## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ALLISON MARIE BROWN,

                *Plaintiff*,

*v.*

COMMISSIONER OF SOCIAL SECURITY,

                *Defendant.*

_____/

CASE NO. 2:17-cv-13137

DISTRICT JUDGE AVERN COHN

MAGISTRATE JUDGE PATRICIA T. MORRIS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 16, 20)

## I.  RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence does not support Defendant Commissioner of Social Security's determination that Plaintiff Allison Brown is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (Doc. 16), be **GRANTED**, the Commissioner's Motion, (Doc. 20), be **DENIED**, the Commissioner's final decision denying benefits be **VACATED**, and the case be **REMANDED** to the Commissioner under "sentence four" of 42 U.S.C. § 405(g).

## II.  REPORT

### A.  Introduction and Procedural History[1]

Plaintiff applied for Title II Disability Insurance Benefits (DIB) on May 19, 2014,

---

[1] Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, (R. 4), this case was referred to me to review the Commissioner's final decision denying Plaintiff's claim for Disability Insurance Benefits.

alleging that her disability had begun roughly three years before. (R. 11, at PageID.342.) The Commissioner denied the claim. (R. 11, at PageID.291.) Plaintiff then requested a hearing before an administrative law judge (ALJ), which occurred on April 25, 2016. (R. 11, at PageID.216-273, 297.)  The ALJ issued a decision on May 27, 2016, finding Plaintiff not disabled during the relevant period. (R. 11, at PageID.194-210.) On July 25, 2017, the Appeals Council denied review, (R. 11, at PageID.32), and Plaintiff sought judicial review on September 25, 2017. (R. 1). She then filed the instant Motion for Summary Judgment on March 16, 2018, (R. 16), and the Commissioner countered with its own Motion three months later, (R. 20).

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not

"try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C.    Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.   ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (R. 11, at PageID.210.) At step one, the ALJ found that Plaintiff's last date of insured status was March 31, 2015, and that she had not engaged in substantial gainful activity since her alleged onset date of January 4, 2010. (R. 11, at PageID.196.) At step

two, the ALJ concluded that Plaintiff had the following severe impairments: degenerative disc disease and herniations of the cervical spine; postconcussion syndrome with migraines; bilateral rotator cuff impingement syndrome; thyroid disorder; and adjustment disorder. (*Id.*) The ALJ also decided, however, that these impairments did not meet or medically equal a listed impairment at step three. (R. 11, at PageID.197.) Next, the ALJ found that Plaintiff had the residual functional capacity (RFC) to perform

> sedentary work [as defined in 20 C.F.R. § 404.1567(a)] with the following limitations: occasional climbing of stairs, crouching, crawling, stooping, and bending; avoid workplace hazards such as dangerous, moving machinery and unprotected heights; no climbing ladders, ropes, or scaffolds; frequent grasping with the bilateral upper extremities; occasional overhead reaching with the bilateral upper extremities; low stress work, which is work that is self-paced and not at a production rate, and which is not in team/tandem with coworkers; and simple, routine, repetitive work.

(R. 11, at PageID.200.) At step four, the ALJ found Plaintiff unable to perform any past relevant work. (R. 11, at PageID.208.) Finally, at step five, the ALJ determined that Plaintiff could perform a significant number of jobs in the national economy. (*Id.*)

### E.     Administrative Record

#### 1.     Overview of the Medical Evidence[2]

Plaintiff traces most of her troubles to January 4, 2010, when she fell down a few granite steps and smacked her head. (R. 11, at PageID.444, 945.) Before her accident she had worked in sales and had previously come close to completing a master's degree. (R. 11, at PageID.463-464.) After the fall, however, she no longer worked. (R. 11, at

---

[2] I have reviewed the entire medical record but will provide only an overview here along with discussion in the analysis below.

PageID.464.) She began to experience migraines, headaches, visual disturbances, neck and back pain, and numbness in her arms and hands, among other maladies. *See, e.g.*, (R. 11, at PageID.463, 945.) The records throughout the insured period—ending on March 31, 2015—and beyond consistently include complaints of these conditions. *See, e.g.*, (R. 11, at PageID.567, 578, 669, 728, 961.)

Plaintiff's primary physician was Dr. Anthony Emmer. She began seeing him shortly after the accident and continued through January 2013, at which point the treatments ceased until they resumed in August 2014 and continued throughout the remainder of the insured status period. (R. 11, at PageID.567, 731, 735.) In April 2016 he completed a medical source opinion form focusing on Plaintiff's headaches. (R. 11, at PageID.978-981.) Symptoms associated with Plaintiff's migraines included nausea, vomiting, throbbing pain, mental confusion, inability to concentrate, mood changes, exhaustion, vertigo, numbness, and visual disturbances, among others; but he did not mention photophobia, (R. 11, at PageID.978), a condition commonly used to diagnose migraines in which light triggers headaches. *See* Digre & Brennan, *Shedding Light on Photophobia*, 32 J. Neuro-Ophthalmology 68 (Mar. 2012), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3485070/pdf/nihms351560.pdf, pp. 2-3. He did, however, state that bright lights both triggered the headaches and made them worse. (R. 11, at PageID.979.) About 4 headaches occurred every week, each lasting 4 to 36 hours. (R. 11, at PageID.978.) Her pain decreased when she laid down in a dark, quiet room and used a cold pack. (R. 11, at PageID.979.) Her condition would vacillate between "good" and "bad" days. (R. 11, at PageID.980.) If she worked, the migraines would take her off

task more than 25 percent of the day and would result in more than four absences per month. (*Id.*) In short, she was incapable of even low stress employment or basic work activities. (R. 11, at PageID.979-980.)

In April 2016 Plaintiff received a similar statement from Dr. Lori Dillard, whom she began seeing in February 2015. (R. 11, at PageID.983.) Many of the observations mirror Dr. Emmer's. But Dr. Dillard also noted that Plaintiff's migraines were often "intractable" and associated with photophobia. (*Id.*) Her estimate of Plaintiff's five headaches a week veered upward from Dr. Emmer's. (*Id.*) The opinion also reported that Plaintiff's efforts to obtain relief—by medication or lying in dark rooms—sometimes helped but often proved futile. (R. 11, at PageID.984.) This generally matches the record evidence; medications and other treatments often granted only fugacious pain alleviation. *See, e.g.*, (R. 11, at PageID.515, 530, 532, 575, 735, 870-914, 962.) Like Dr. Emmer, Dr. Dillard believed that Plaintiff would be off task for more than 25 percent of the day. (R. 11, at PageID.985.) She also concluded that Plaintiff would miss 20 days or more of work each month and was generally incapable of work. (*Id.*)  By contrast, in an earlier medical opinion from October 2014, medical evaluator Dr. Thomas Tsai reviewed the extant records and determined that Plaintiff had only mild restrictions in her daily activities and moderate restrictions in concentration, persistence, and pace. (R. 11, at PageID.283.)

Certain objective evidence from all the medical sources remained markedly consistent throughout the relevant period. Imaging studies of her brain failed to uncover any abnormalities or pathologies. (R. 11, at PageID.567, 683-684, 686, 708, 713, 739, 833, 852.) Imaging of her spine displayed degenerative discs. (R. 11, at PageID.680, 710, 738,

859.) Physical examinations measuring her alertness, gait, strength, range of motion, or the like usually produced normal results, sometimes with tenderness in her back. *See, e.g.*, (R. 11, at PageID.445, 447, 520, 523, 527, 529, 530, 567, 569, 571, 575, 576, 610, 613, 616-618, 621, 626, 632, 644, 649, 736, 828, 992.) On a few occasions, however, her strength or range of motion were diminished. *See, e.g.*, (R. 11, at PageID.445, 501, 518, 531, 537, 578, 670-671, 717.)

During the summer following her accident, Plaintiff went through the Functional Recovery Program supervised by Dr. Maury Ellenberg. (R. 11, at PageID.480-509.) Her goals upon entering the program were, among other things, to return to work, obtain her master's degree, and resume her normal household chores and care of her son. (R. 11, at PageID.508.) Throughout the Program, Dr. Ellenberg's assessment of Plaintiff's progress was positive. (R. 11, at PageID.482, 485, 489, 493, 497, 501, 505.) On some days, Plaintiff reported handling housework or socializing with friends. (R. 11, at PageID.483, 487, 491, 495, 500.) But on discharge from the Program, Plaintiff "rate[d] her pain the same as when she came in," with only minor improvements in certain areas. (R. 11, at PageID.480.)

In the months after her accident, she underwent testing and treatment that bears on her credibility. In February 2010, Dr. Renee Applebaum administered various neuropsychological tests. (R. 11, at PageID.462.) The report warned that Plaintiff's performance "suggest[s] some possible intention to exaggerate or feign deficits" and consequently the results should "be interpreted with great caution." (R. 11, at PageID.465.) While "psychogenic factors" could explain her "symptomatic complains," the "severity of neuropsychological impairment could not necessarily be explained by concussion alone."

8

(R. 11, at PageID.468.) Dr. Applebaum advised explaining to Plaintiff that her "symptoms are disproportionate to the concussive event." (R. 11, at PageID.469.)

However, a psychological evaluation by Dr. Maryjo Gavin reported that Plaintiff had "high levels of somatic complaints consistent with her clinical presentation." (R. 11, at PageID.472.) One of the validity tests revealed "little evidence of defensiveness [or] exaggeration." (*Id.*) Yet the report also stated that individuals with Plaintiff's profile would likely overreact to physical dysfunctions. (R. 11, at PageID.472-473.) Finally, Dr. Ellenberg, who headed the Recovery Program Plaintiff participated in, observed "a functional perceptual dissociation. She seems to be functioning well in the program, but her perception of her function is much more limited." (R. 11, at PageID.481.)

Records from 2013 and the first two-thirds of 2014 are somewhat sparse. From January 2013 through April 2013, Plaintiff saw Dr. Jeffrey Last for psychotherapy. (R. 11, at PageID.512-514.) She continued to complain of headaches but also began considering employment. (*Id.*) In August 2014 she returned to Dr. Emmer for the first time since January 2013. (R. 11, at PageID.735.) Treatments with Dr. Emmer continued well past Plaintiff's last insured date of March 2015. *See, e.g.*, (R. 11, at PageID.728 (treatment from May 2015).)

The record also contains other post-insured status evidence. A string of emergency room visits due to migraines began in April 2015. (R. 11, at PageID.1000-1031, 1037-1042, 1051-1055.) She often claimed to have experienced vomiting, photophobia, and blurred vision, and while at the hospital she frequently rested in a darkened room. *See, e.g.*, (R. 11, at PageID.1024, 1030.) But the examinations during these periods—gauging her

range of motion, alertness, gait, and similar measures—returned normal results. *See, e.g.*, (R. 11, at PageID.698-699, 1030.) Plaintiff also attempted a course of physical therapy in late 2015 but was discharged for noncompliance. (R. 11, at PageID.962.) The notes stated that Plaintiff had improved while actively participating, but the gains were erased due to the gap in treatment. (*Id.*)[3]

### 2.    Application Reports and Administrative Hearing

#### i.    Plaintiff's Reports

In her function report, completed in July 2014, Plaintiff claimed to suffer from severe headaches and neck, back, and jaw pain. (R. 11, at PageID.396.) On a typical day, she tried to care for her son and attend doctor's appointments. (R. 11, at PageID.397.) Family members helped with the son. (*Id.*) With the illnesses, she could no longer sleep through the night or reach above her head. (*Id.*) She still could prepare simple meals "sometimes" and do light housework about three times a week for two to three hours each occasion. (R. 11, at PageID.398.) But she needed to be encouraged to do these tasks, as well as reminded to take her medications. (*Id.*)

She left the house daily, sometimes alone, and could walk or ride in a car. (R. 11, at

---

[3] Plaintiff submitted additional evidence to the Appeals Council. (R. 11, at PageID.33.) In denying review, the Council noted that evidence related to the post-insured status period and therefore was not relevant to the decision. (*Id.*) Indeed, the items—which include emergency room records and notes from Dr. Emmer, among other things—were all produced after March 2015. (R. 11, at PageID.53-190.) The records display Plaintiff's ongoing complaints of migraines. But they are beyond the Court's power to consider. When the Council denies review, the ALJ's determination becomes the final reviewable decision. 20 C.F.R. § 404.981; *Meeks v. Sec'y of Health & Human Servs*, 996 F.2d 1215, 1993 WL 216530, at *1 (6th Cir. 1993) (unpublished). In such cases, even though the claimant might have submitted additional evidence to the Council, 20 C.F.R. § 404.970(a), that evidence "cannot be considered part of the record for purposes of substantial evidence review." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).

PageID.399.) But driving even a short distance caused dizziness and nausea. (*Id.*) Shopping and handling money posed no obstacles for her. (*Id.*) For fun, she read, watched television, and enjoyed sports and dance; but these were rare events. (R. 11, at PageID.400.) Nonetheless, she maintained a social life. (*Id.*)

Her illnesses had a deleterious effect on numerous functional abilities, including lifting, bending, standing, reaching, walking, sitting, kneeling, hearing, seeing, completing tasks, concentrating, getting along with others, and her memory. (R. 11, at PageID.401.) She could walk for a mile and stay focused for 20 minutes. (*Id.*) Tasks that she started would often go unfinished, and she struggled to follow instructions. (*Id.*) After her injury, she did not handle stress well. (R. 11, at PageID.402.)

### ii.    Plaintiff's Testimony at the Administrative Hearing

Plaintiff testified that she lived with her mother and son. (R. 11, at PageID.226.) She had been working on obtaining a master's degree, but was not currently enrolled in classes. (R. 11, at PageID.227.) She then discussed her previous work and training, which included "insurance license" training, a stint as a notary public, and various office jobs in areas such as sales and recruiting. (R. 11, at PageID.227, 229-237.) But she had not worked since her accident in January 2010. (R. 11, at PageID.237.) At first, she got by on worker's compensation checks. (*Id.*) After that, her mother supported her. (*Id.*)

The worst ailment she faced was the migraines. (R. 11, at PageID.238.) They had plagued her since her fall six years earlier, and were becoming ever more frequent. (*Id.*) In 2013, "they were a little more manageable," occurring once or twice a week. (*Id.*) And at that point the medication was still providing some relief. (R. 11, at PageID.239.) Typically,

the migraine would thunder into her head, she would pop her medication, and after four to six hours of sleep she could resume her normal activities. (*Id.*) Later, when her worker's compensation benefits stopped, she could no longer obtain any of the more effective medications, and the migraines consequentially struck more often and with greater force. (*Id.*) About three days a week the migraines would lay her out for five to six hours. (R. 11, at PageID.241.) The medications also exacerbated some of the migraine symptoms, such as drowsiness, dizziness, and nausea. (*Id.*)[4] Sounds, pungent scents, and lights could spark a migraine—she wore her sunglasses throughout the hearing. (R. 11, at PageID.242.) These triggers had grown worse recently, but even two or three years before she usually spent over half the day in a darkened, quiet room. (*Id.*) Recent hospitalizations had occurred with alarming frequency, but a year prior they had been less usual. (R. 11, at PageID.243.) Dr. Emmer had treated her for about six years and had attempted numerous methods to decrease the pain, including medications, physical therapy, and injections. (R. 11, at PageID.244.)

She was scheduled for a cervical fusion surgery to treat her neck pain, which had lingered since her 2010 accident. (*Id.*) The pain radiated to her arms, causing numbness and weakness and reducing her ability to grip objects. (R. 11, at PageID.244-245.) Problems with her shoulders prevented her from making upward motions without incurring a migraine due muscle tightness and contraction. (R. 11, at PageID.246.) Spells of vertigo could commence from simple motions of her head or even from simply observing other

---

[4] At one point during the hearing, Plaintiff was overcome with nausea and left for the bathroom, where she reported having vomitted. (R. 11, at PageID.257-259.)

objects in motion. (R. 11, at PageID.247.) A few minutes of standing were all she could muster, and even then she felt unsteady while up. (*Id.*)

Two or three years ago, she would spend a typical day getting her son ready for school and sometimes even taking him the half-block to the school by herself. (R. 11, at PageID.249-250.) The next few hours would be spent taking medicine and resting. (R. 11, at PageID.249.) But now she could manage these tasks only on good days; when she felt particularly poor, she could not "even get up . . . to take my medicine," she reported. (*Id.*) These bad days struck once or twice a week. (R. 11, at PageID.250.)

She used to attend her son's basketball games, as recently as the past winter. (R. 11, at PageID.254.) Yet she usually could handle the bright gymnasium lights for only so long before retreating to the car to rest. (R. 11, at PageID.254-255.)

### iii.      The VE's Testimony at the Administrative Hearing

The ALJ constructed the following hypothetical individual with Plaintiff's characteristics who

> would have the ability to perform the full range of . . . light exertion [work], but there are additional non-exertional limitations to be considered. She could only occasionally climb stairs or crouch or crawl or kneel or stoop or bend.
>
> She's not able to work near hazards, and hazards would be things such as dangerous moving machinery or working at unprotected heights, so she's not able to climb any ladders or ropes or scaffolding. She would be able to occasionally reach overhead with her upper extremities. She could use her upper extremities for grasping, but on a frequent, not constant basis. The work should be something simple, routine and repetitive . . . and also low stress, and by low stress I mean it's a self-paced job, she's not working at a production rate or in team or tandem with her coworkers.

(R. 11, at PageID.262.) With that RFC, the VE testified, an individual could perform

13

various jobs: inspector (60,000 positions nationally), packager (60,000 positions nationally), and gate attendant (80,000 positions nationally). (R. 11, at PageID.263.) If the same individual were further limited to sedentary work, she could work as an inspector (36,000 positions nationally) and a surveillance monitor (50,000 positions nationally). (*Id.*) Limiting the individual to frequent (not constant) fingering would not affect the jobs available. (*Id.*) But if the individual could withstand only two hours of fluorescent lighting a day, no jobs would be open to her. (R. 11, at PageID.264.) A similar four-hour limitation on lighting would also preclude work. (R. 11, at PageID.265.) If the individual required a quiet work environment, she could be employed in the gate attendant and surveillance monitor positions above. (R. 11, at PageID.266.)

An individual who required 15-minute unscheduled breaks every hour could not work, the VE testified. (*Id.*) And if the hypothetical individual missed work at least two days per month, she would be unable to maintain employment. (R. 11, at PageID.266-267.) Any off-task time over 15 percent of the day would preclude employment. (R. 11, at PageID.268.) An individual who could only occasionally look at a television screen or computer monitor could not perform the surveillance job. (*Id.*) A further limitation to only occasional reaching would prevent work as an inspector, but not as a surveillance system monitor. (R. 11, at PageID.271.) A limitation to occasional head movements would reduce the number of available jobs to some unspecified level, and a requirement that no objects move across the visual field would prevent work as a gate attendant and surveillance monitor. (*Id.*) If Plaintiff's testimony were taken at face value, she could not work because her migraines would cause too many absences and lead her off task too often. (R. 11, at

14

PageID.267.)

## F.      Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations[5] carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513 (2016). "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a) (2016). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d) (2016). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an

---

[5] Various amendments have been made to the regulations since Plaintiff filed her claim. *See, e.g.*, Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (January 18, 2017) (effective March 27, 2017). Because the changes do not alter the outcome here—and, relatedly, they do not appear to exercise an impermissible retroactive effect on Plaintiff's rights, as the amendments are largely procedural changes in the process for analyzing evidence, *cf. Combs v Comm'r of Soc. Sec.*, 459 F.3d 640, 647 (6th Cir, 2006)—and the parties do not discuss them, it is unnecessary to determine whether they apply. Therefore, like many other courts, I will utilize the regulations in effect when Plaintiff filed her claim and the case was decided by the ALJ, along with the new regulations that explicitly apply to claims during this period. *See, e.g.*, 20 C.F.R. § 404.1527; *see generally* Revisions to Rules Regarding the Evaluation of Medical Evidence, 81 Fed Reg. 62560, 62578 (September 9, 2016); *see also Rodriguez v. Colvin*, 3:15CV1723, 2018 WL 4204436, at *4 n. 6 (D. Conn. 2018) ("[T]he Court reviews the ALJ's decision under the earlier regulations because the plaintiff's application was filed before the new regulations went into effect." (citing *Maloney v. Berryhill*, No. 16-cv-3899, 2018 WL 400772, at *1 (E.D. N.Y. 2018) (same))); *Miller v. Comm'r of Soc. Sec.*, No. 1:17CV0718, 2018 2773372, at *5 n. 3 (N.D. Ohio 2018) ("Plaintiff's claim was filed before March 27, 2017, and the ALJ's decision was rendered before the new regulations took effect. For the sake of consistency, the court continues to cite the language from the former regulations that were in effect at the time of the ALJ's decision."), *rep. & rec. adopted by* 2018 WL 2766020 (N.D. Ohio 2018); *Woodall v. Berryhill*, No. 1:17-cv-01289, 2018 WL 3133442, at *7 n. 3 (N.D. Ohio 2018) (applying the rules effective when the claimant applied for benefits), *rep. & rec. adopted by* 2018 WL 3126552 (N.D. Ohio 2018); *Meeks v. Comm'r of Soc. Sec.*, No. 4:17-cv-45, 2018 WL 1952529, at *4 n. 2 (E.D. Tenn. 2018) (applying the rules effective when the ALJ decided the case).

individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed her claim before March 27, 2017, she is entitled to the benefit of the treating-source rule. Under that rule, certain opinions from her treating physicians can receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the

16

claimant's impairments. 20 C.F.R. § 404.1527(c)(2). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d). Thus, the ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits must give specific reasons, supported by record evidence, for the weight granted to a treating source's opinion. *Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must also analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996).[6] Credibility determinations regarding a claimant's subjective complaints rest with

---

[6] Although the Commissioner has rescinded SSR 96-7p and eliminated the term "credibility" from Administration policy, SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016), the underlying regulation has remained materially unchanged, *see* 20. C.F.R. § 404.1529(c), and I agree with the courts in this District that have continued to apply SSR 96-7p to cases arising prior to its rescission. *See, e.g.*, *Cooper v. Comm'r of Soc. Sec.*, No. 16-cv-13477, 2017 WL 3923984, at *3 (E.D. Mich. August 21, 2017), *Rep. & Rec. adopted*

the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529(a) (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529 (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments will "not alone establish that [he or she is] disabled." 20 C.F.R. § 404.1529(a). Nonetheless, the ALJ may not disregard the

---

*by* 2017 WL 3891971 (E.D. Mich. Sept. 9, 2017); *Tuttle v. Comm'r of Soc. Sec.*, No. 16-11144, 2017 WL 2928021, at *6 n. 3 (E.D. Mich. June 9, 2017), *Rep. & Rec. adopted by* 2017 WL 2905125 (E.D. Mich. July 7, 2017).

claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective, confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)     Treatment, other than medication, . . . received for relief of . . . pain;
(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing the RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). The RFC "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G.      Arguments and Analysis

### 1.      The Parties' Arguments

Plaintiff takes aim at the ALJ's analysis of her migraines, in the process invoking the treating physician rule. She begins by noting that migraines are, by their nature, intermittent. (R. 16, at PageID.1087.) But when they strike, Plaintiff would be thrown off task more than a quarter of the work day or forced to absent herself entirely at least four days a month, according to Dr. Emmer. (R. 16, at PageID.1088.) Thus the ALJ's assertion, that the RFC's limitation on postural activities and workplace hazards accounts for the migraines, (R. 11, at PageID.208), is misguided, as these limitations do not address off-task time or absenteeism. (R. 16, at PageID.1087-1088, 1092.)

She then attacks the ALJ's rationale for discounting Dr. Emmer's opinion. One of the reasons for discrediting Dr. Emmer was that the results of his physical examinations of Plaintiff from 2010 through 2012 "were relatively unremarkable." (R. 11, at PageID.206.) In opposition to this observation, Plaintiff highlights her testimony that the migraines were "a little more manageable" at that period because she was still receiving worker's compensation benefits and could afford effective medications. (R. 11, at PageID.238-239); (R. 16, at PageID.1089-1090.) Once the benefits ceased, she could not obtain those medications and the symptoms consequently increased. (R. 11, at PageID.238-239); (R. 16, at PageID.1089-1090.)

Another reason the ALJ gave for his dim assessment of Dr. Emmer's opinion was the 18-month gap in treatment from January 2013 until August 2014. (R. 11, at PageID.207.) In the ALJ's view, such a crack in the course of treatment was "inconsistent

with the finding that the claimant would miss more than 4 days of work per month[.]" (*Id.*) Plaintiff protests that this line of reasoning ignores the explanation for the gap: her insurance no longer covered sessions with Dr. Emmer. (R. 16, at PageID.1090.) This justification is borne out by the very last record from the start of the gap, in which Plaintiff informed Dr. Emmer that her insurance had run out. (*Id.*); (R. 11, at PageID.578.) Plaintiff adds that her migraines grew more intense beginning in March 2015 at the tail end of her insured status. (R. 16, at PageID.1089-1090.) As evidence, she points to records from Dr. Dillard dated March 4, 2015, and April 13, 2015, in which she described "terrible" headaches lasting days. (R. 11, at PageID.931, 937.); (R. 16, at PageID.1089-1090.)

The ALJ also surmised that Plaintiff's job search in April 2013 undercut Dr. Emmer's opinion. (R. 11, at PageID.206, 513-514.) But the search was hardly a dogged quest for employment, according to Plaintiff. (R. 16, at PageID.1092.) She paused the search for a period while her headaches were severe and even when she returned to it her intention was to find work that could accommodate her limitations, likely meaning a part-time position. (R. 11, at PageID.514); (R. 16, at PageID.1091.)

Finally, Plaintiff contends that Dr. Emmer's opinion is supported by Dr. Dillard's, who Plaintiff characterizes as another treating physician. (R. 16, at PageID.1092.) The ALJ's analysis of Dr. Dillard's opinion was flawed, Plaintiff argues. (*Id.*) Regardless of whether Dr. Dillard's findings that Plaintiff was unsteady and had vertigo were supported by the record—the ALJ concluded they were not, (R. 11, at PageID.207)—this purported inconsistency is irrelevant to Plaintiff's migraines. (R. 16, at PageID.1092.) And while Plaintiff had seen Dr. Dillard for only two months prior to the end of the insured-status

21

period, Dr. Dillard's opinion was rendered much later, after more than 35 appointments spanning over a year's time. (R. 16, at PageID.1093.)

In response, Defendant notes that the objective evidence from Plaintiff's examinations displayed a "good range of motion of the cervical spine, full strength in all extremities, intact sensation, and intact coordination." (R. 20, at PageID.1112-1113.) These findings, many of which came from Dr. Emmer's own notes, undermine that physician's medical opinion. (R. 20, at PageID.1115.) Defendant also pounces on Plaintiff's concession that her migraines were more manageable during 2010 through 2012. (*Id.*, citing (R. 16, at PageID.1074).)

Defendant likewise makes use of Plaintiff's gap in treatment, noting that upon her return to Dr. Emmer her examination results—such as her gait, strength, and reflexes— were normal except for positive trigger points in her cervical spine. (R. 20, at PageID.1116.) Even into the post-insured status period, Plaintiff's examinations were unremarkable. (*Id.*) Thus the gap did not dent Plaintiff's condition, as would be expected if her migraines were truly debilitating. (R. 20, at PageID.1117.) As for Plaintiff's protestations that the gap resulted from lack of insurance, Defendant points to three records from the gap period in which Plaintiff sought gynecological treatment and examination of her eye but made little mention of migraines. (*Id.*); (R. 11, at PageID.642-649.) Her examinations at these sessions were normal, and she did not attend the emergency room for her headaches during the gap period. (R. 20, at PageID.1118.) Finishing off the analysis of Dr. Emmer, Defendant notes that Plaintiff's desire to work displays her belief that she could work regardless of whether the search was temporarily halted. (R. 20, at

PageID.1119.)

Turning to Dr. Dillard's opinion, Defendant contends that the ALJ properly noted that Dr. Dillard had only treated Plaintiff for two months before the expiration of her insured status. (R. 20, at PageID.1120 & n. 4.) From there, Defendant generally reiterates the ALJ's analysis. (R. 20, at PageID.1121.)

On a closing note, Defendant observes that both Dr. Emmer's and Dr. Dillard's opinions were "based solely on Plaintiff's subjective complaints of pain and limitation, which the ALJ found to be inconsistent with the medical evidence." (*Id.*) Acknowledging that the ALJ did not rely on this basis for rejecting the medical opinions, Defendant nevertheless points out that Plaintiff has failed to challenge the ALJ's credibility assessment. (R. 20, at PageID.1121-1122.) Such medical opinions formed merely by discredited subjective complaints are not entitled to controlling weight. (*Id.*, citing *Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990).)

### 2.  Analysis

This is a close case, largely due to the murky nature of migraines. The central issue is whether the ALJ provided good reasons for rejecting the treating physician opinions of Dr. Emmer and Dr. Dillard. Below, I examine the primary reasons the ALJ gave, which include the lack of objective evidence, the treatment gap, Plaintiff's job search, and, regarding Dr. Dillard, the short treatment period prior to the close of the insured status period. Except for the last rationale relating to Dr. Dillard, which was permissible, I conclude that these were not "good reasons" justifying the ALJ's determination. Because this error could affect the outcome of the case, I recommend remand.

###### i.      Lack of Objective Evidence

The ALJ and Defendant rely heavily on the supposed lack of objective evidence verifying the existence and extent of Plaintiff's migraines. Throughout her lengthy decision, the ALJ returns again and again to the imaging studies that revealed no cerebral pathologies and the physical examinations that exposed normal gait, muscle strength, range of motion, and reflexes. *See, e.g.*, (R. 11, at PageID.204 ("Therefore, the objective medical evidence consistently indicates good functional range of motion of the cervical spine, normal range of motion of all extremities, good strength in all the extremities, intact sensation, and intact coordination.").) These findings formed the ground of the ALJ's assessment of Dr. Emmer's and Dr. Dillard's opinions. (R. 11, at PageID.206-207.)

As a factual matter, the ALJ was not mistaken. With some minor variation, Plaintiff's tests typically returned normal results. *See, e.g.*, (R. 11, at PageID.445, 447, 501, 518, 520, 523, 527, 529, 530, 531, 537, 567, 569, 571, 575, 576, 578, 610, 613, 616-618, 621, 626, 632, 644, 649, 670-671, 680, 710, 717, 736, 738, 828, 859, 992.) But neither the ALJ nor Defendant asks the crucial question: so what? Are these findings reliable evidence that chronic migraines did not render Plaintiff unfit for work? More generally, what types of evidence credibly attest to disabling migraines?

Courts and others addressing this question give reason to reject the ALJ's reliance on these findings. To start, MRIs are used "*to rule out other possible causes of headache—such as a tumor—meaning that an unremarkable MRI is completely consistent with a migraine diagnosis.*" *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014) (emphasis in original) (citing, "Migraines: Tests and Diagnosis," Mayo Clinic,

http://www.mayoclinic.org/diseases-conditions/migraine-headache/basics/tests–

diagnosis/con–20026358); *Wiltz v. Barnhart*, 484 F. Supp. 2d 524, 532 (W.D. La. 2006).

This use of MRIs as broad screens rather than precise diagnostic tools reflects the fact that

the pathophysiology—or the study of how disorders affect the functions and activities of

organs and the like, 4, J.E. Schmidt, *Attorney's Dictionary of Medicine and Word Finder*,

P-111 (2013)—is complex and incompletely understood. *See The Merck Manual*, 1376

(17th ed.) ("The cause [of migraines] is unknown, and the pathophysiology is not fully

understood. Changes in brain and scalp arterial blood flow occur, but whether vasodilation

and vasoconstriction are a cause or an effect of the migraine is unclear."); David Borsook

& David Dodick, *Taking the headache out of migraine*, Neurology: Clinical Practice, 320

(Aug. 2015); *see also McCormick v. Sec'y of Health & Human Servs.*, 666 F. Supp. 121,

123 (E.D. Mich. 1987) (noting that migraines "are not traced easily to an objective medical

condition"). As a result, "while medical imaging may be able to capture physical changes

or abnormalities in the brain tending to support an individual's complaints of migraine-

related pain, it does not conversely follow that the absence of such evidence undermines

such complaints." *Blevins-Bryant v. Colvin*, No. 3:14cv00237, 2015 WL 449857, at *4

(S.D. Ohio July 23, 2015), *rep. & rec. adopted by* 2015 WL 4743034 (S.D. Ohio Aug. 11,

2015).

The upshot for disability claims is that the traditional forms of "objective evidence"

lack their usual ascendancy in this context. Many courts have found the absence of imaging

or diagnostic tests showing migraines cannot justify discrediting a claimant or medical

source opinions. *See Brown v. Astrue*, No. 2:07cv1114-CSC, 2008 WL 4846863, at *2

25

(M.D. Ala. Nov. 7, 2008) ("[N]either the Social Security Administration nor the federal courts require that the severity of migraine headaches be proven through objective clinical findings."). In one case the ALJ noted the absence of "'tests, hospitalizations, MRI's, brain scans, etc. to provide a basis for the complaints of headaches. The undersigned concludes that the doctor appears to rely heavily on the claimant's subjective complaints in reaching his conclusions.'" *Wiltz*, 484 F. Supp. 2d at 531-532 (quoting ALJ decision). Given the purely notional nature of tests, the court had no problem holding that "[t]he ALJ's insistence upon objective medical evidence of Wiltz's migraine headaches was error." *Id.* at 532.

More directly analogous to the present case is *Stebbins v. Barnhart*, No. 03-C-0117-C, 2003 WL 23200371, at *10 (W.D. Wis. Oct. 21, 2003) (adopting rep. & rec.). There, "[t]he ALJ believed that plaintiff's complaints of disabling headache pain were undermined by the absence of objective medical evidence showing some abnormality of neurological, motor or sensory function." *Id.* This belief was erroneous. "[M]igraine headaches do not stem from a physical or chemical abnormality that can be detected by imagining techniques, laboratory tests, or *physical examination*." *Id.* (emphasis added). The court held that "[b]ecause there is no medical test available to confirm the presence or severity of migraine headaches, it was improper for the ALJ to rely on the absence of such evidence as a reason to discount plaintiff's testimony." *Id.*; *see also Fields v. Colvin*, 213 F. Supp. 3d 1067, 1072 (N.D. Ind. 2016) (citing *Stebbins* and reaching the same conclusion); *Saunders v. Comm'r of Soc. Sec.*, No. 3:14-cv-97, 2015 WL 6858323, at *5

(S.D. Ohio Sept. 8, 2015) ("[M]igraine headaches 'cannot be diagnosed or confirmed through laboratory or diagnostic techniques' . . . . Accordingly, the purported lack of objective findings is not a good reason to discount his opinion." (quoting *Jones v. Astrue*, No. 09-1061-WEB, 20120 WL 2464845, at *4 (D. Kan. Mar. 22, 2010))); *Blevins-Bryant*, 2015 WL 4498573, at *5 (holding that the ALJ "erred by relying on the lack of objective evidence of Plaintiff's migraines to assess the severity and frequency of headaches").

This is not to say, however, that diagnosis of migraines is unamenable to all objective criteria. Courts instead look to the tools physicians use to measure migraines. "Diagnosis is based on the symptom patterns when there is no evidence of intracranial pathologic changes." *The Merck Manual*, *supra* at 1376. The relevant clinical criteria include "'recurrent headache that: lasts from 4 to 72 hours; is throbbing, is moderate to severe in intensity; is localized to one side of the head; and is associated with nausea, vomiting or sensitivity to light, sound or smell." *Fields*, 213 F. Supp. 3d at 1072; *see also Saunders*, 2015 WL 6858323, at *5 (noting a similar list); *Stebbins*, 2003 WL 23200371, at *2 (same). Another court has given a similar but slightly broader list:

> Thus, in cases involving complaints of disabling pain due to migraine headaches, courts look to other objective medical signs to determine whether the claimant's complaints are consistent with the existence of disabling migraine pain, including whether the claimant's migraines are accompanied by drowsiness, dizziness, nausea, vomiting and blurred vision, whether the claimant has been prescribed medication for migraines and the associated symptoms of nausea and vomiting, whether the plaintiff is sensitive to light (photophobic) or sound, whether the claimant has received continuing and regular treatment for migraines—including outpatient and emergency treatment—and whether the claimant's symptoms are consistent with those of migraine headaches.

*Wiltz*, 484 F. Supp. 2d at 533 (collecting cases); *see also Blevins-Bryant*, 2015 WL

4498573, at *4 (same); *Thompson v. Barnhart*, 493 F. Supp. 2d 1206, 1215 (S.D. Ala. 2007) (same).

These are the empirical medical markers—the "'objective' evidence"—of migraines. *Thompson*, 493 F. Supp. 2d at 1216. While they might appear in the guise of self-reported symptoms, "when documented by a physician in a clinical setting [they] are, in fact, medical signs which are associated with severe migraine headaches and are often the only means available to prove their existence." *Leeson v. Colvin*, No. 1:14-cv-01223, 2015 WL 5228026, at *2 (S.D. Ind. Sept. 8, 2015). These observable symptoms reflect the standard benchmarks found in the medical literature. *See* Mark W. Weatherall, *The diagnosis and treatment of chronic migraine*, 6 Therapeutic Advances in Chronic Disease 115, 117 (2015) (durational requirements, nausea, photophobia, and at least two of the following: unilateral location, pulsating quality, moderate or severe pain level, and aggravating by routine physical activity); Loretta L. Mueller, *Diagnosing and Managing Migraine Headache*, 107 J. Am. Osteopathic Assoc. 10, 10-11 (Nov. 2007) (noting various diagnostic criteria including aura, duration, nausea, vomiting, unilateral location of headache, pulsating quality, photophobia, and moderate to severe pain level).

This approach to analyzing migraines is supported by analogy to how the Listings deal with them. While no Listing exists for this condition, the Commissioner and the courts have analogized it, for purposes of determining medical equivalence, to the nonconvulsive epilepsy listing, which was Listing § 11.03 but is now part of Listing § 11.02. *See Beerman v. Comm'r of Soc. Sec.*, No. 2:16-cv-896, 2018 WL 1187804, at *7 & n. 3 (S.D. Ohio Mar. 7, 2018); *Davis v. Berryhill*, No. 16-14470, 2017 WL 5493137, at *2 (E.D. Mich. Nov. 16,

2017) (analyzing medical equivalence of a migraine to Listing § 11.03), *rep. & rec.*
*adopted by* 2017 WL 6206368 (E.D. Mich. Dec. 8, 2017); *Mann v. Colvin*, 100 F. Supp.
3d 710, 719 (N.D. Iowa 2015) ("Many federal courts, including this court and others in the
Eighth Circuit, have discussed Listing 11.03 in connection with migraine headaches.").[7]
At the time of the hearing in this case,[8] § 11.03 stated:

> Epilepsy—nonconvulsive epilepsy (petit mal, psychomotor, or focal),
> documented by detailed description of a typical seizure pattern, including all
> associated phenomena; occurring more frequently than once weekly in spite
> of at least 3 months of prescribed treatment. With alteration of awareness or
> loss of consciousness and transient postictal manifestations of
> unconventional behavior or significant interference with activity during the
> day.

20 C.F.R., Pt. 404, Subpt. P. App. 1 § 11.03 (May 2016). The Commissioner has explained
in informal guidance that listing 11.03 . . . is still the most analogous listing for considering
medical equivalence" of migraines. SSA Questions & Answers 09-036, at p. 3, *available*
*at* https://www.paletta.org/wp-content/uploads/2018/02/SSA-QA_09-036.pdf.

    In describing how the equivalence analogy works, the Commissioner elucidated the
analysis of migraines. In particular, the informal guidance endorses the same diagnostic
criteria listed above: that the headache must last from 4 to 72 hours; be accompanied by
any two of the following three conditions, throbbing quality, moderate to severe pain, or
worsened by routine physical activity; and also have at least one of the following effects,

---

[7] The ALJ here did not analyze this Listing.

[8] Listing § 11.03 was removed on July 1, 2016 as part of the amendment process creating present Listing §
11.02. Soc. Sec. Admin., *Revised Medical Criteria for Evaluating Neurological Disorders*, 81 Fed. Reg.
43,048, 43,060 (July 1, 2016). The Commissioner's rule promulgation, however, noted the administration's
expectation "that Federal courts will review the Commissioner's final decisions using the rule that were
[sic] in effect at the time we issued the decision." *Id.* at 43,051 n. 6.

nausea, vomiting, photophobia, or phonophobia. *Id.* at 2. Applying the language of the Listing to migraines, the Commissioner instructed that the "detailed description" of the headache would include symptoms such as aura, duration, intensity, and treatment; the "[o]ccuring more frequently" requirement would translate to the headache frequency; the "with alteration of awareness" requirement would mean just that, although this is unnecessary if the migraines interfered with daily activities, as explained next; and "interference with activity" could be satisfied in the context of a migraine by the "need for a darkened, quiet room, lying down without moving, or a sleep disturbance that impacts on daytime activities." *Id.* at 3-4. A different guidance document sketches an example of what medical equivalence might look like:

> A claimant has chronic migraine headaches for which she sees her treating doctor on a regular basis. Her symptoms include aura, alteration of awareness, and intense headache with throbbing and severe pain. She has nausea and photophobia and must lie down in a dark and quiet room for relief. Her headaches last anywhere from 4 to 72 hours and occur at least 2 times or more weekly. Due to all of her symptoms, she has difficulty performing her ADLs. The claimant takes medication as her doctor prescribes. The findings of the claimant's impairment are very similar to those of 11.03, Epilepsy, non-convulsive. Therefore, 11.03 is the most closely analogous listed impairment. Her findings are at least of equal medical significance as those of the most closely analogous listed impairment. Therefore, the claimant's impairment medically equals listing 11.03.

Program Operations Manual Sys. DI 24505.015(A)(7)(b).

The listing analysis, then, supports the proposition that "objective evidence" of migraines does not depend on imaging studies, strength or gait tests, intact reflexes, or other data captured by the typical physical examination. Rather, the germane questions involve symptoms and signs such as visual disturbances, photophobia, and the duration

and intensity of the headaches. When these converge, not only is the existence of migraines a possibility, a finding of disability might also be required.

The Sixth Circuit has not directly addressed these issues. Somewhat ominously for the above analysis, however, the court has rejected finding that "subjective complaints of pain [due to migraines] during the physician visits, or the eventual diagnosis of claimant's condition, were credible enough to rise to the level of 'objective medical evidence.'" *Long v. Commissioner of Soc. Sec.*, 56 F. App'x 213, 214 (6th Cir. 2003) (citing *McCormick v. Sec'y of Health & Human Servs.*, 861 F.2d 998 (6th Cir. 1988)). Some courts in this Circuit have read this statement as a rejection of the caselaw above. *See, e.g., Donerson v. Comm'r of Soc. Sec.*, No. 1:16 CV 3028, 2017 WL 6987958, at *7 (N.D. Ohio Dec. 28, 2017), *rep. & rec. adopted by* 2018 WL 454392 (N.D. Ohio Jan. 16, 2018).

I disagree. The Sixth Circuit simply said that objective evidence, as opposed to complaints or the bare diagnoses themselves, is necessary in migraine cases. But the court has not yet looked at the precise issue of what constitutes relevant "objective" evidence in this context. The courts above along with the Commissioner have begun delineating this sphere of evidence. Further, it seems uncontroversial to expect that the evidence, objective or not, must bear upon the condition at hand—an ALJ could not, for example, normally cite the absence of x-rays of a claimant's feet as proof that a claimant's arm injury is not disabling. Like so, the ALJ should at least be able to explain why the absence of abnormal physical examinations and imaging studies is relevant proof discrediting migraines.

The Sixth Circuit's stance on fibromyalgia, moreover, supports the notion that ALJs should examine the pertinent criteria based on the state of medical knowledge. In that

31

context, the Sixth Circuit has recognized that fibromyalgia—like migraines—"is not susceptible of objective verification through traditional means." *Rogers*, 486 F.3d at 244. Instead, the court looked to the records for the "medically-accepted and recognized signs of fibromyalgia." *Id.* These came in the form of the claimant's complaints of "tenderness in the appropriate focal points." *Id.* at 244-245. Given the uniqueness of the disease, medical "opinions that focus solely upon objective evidence are not particularly relevant," the Sixth Circuit stated. *Id.* at 245. This approach to fibromyalgia was dictated by the condition's limited susceptibility to traditional forms of objective measurement; because migraine diagnosis has the same limitations, the Sixth Circuit's approach to fibromyalgia is instructive here.

In the present case, I suggest that the normal physical examinations and imaging studies do not constitute "good reasons" sufficient to reject the treating physicians' medical opinions. At the very least, even if Sixth Circuit caselaw allows ALJs to credit the absence of traditional "objective evidence," the ALJ should still consider the relevance of that evidence to the migraine. As noted above, such evidence does not usually relate to migraines. The ALJ here did not explain why the objective evidence of strength tests, imaging, and the like were necessary or helpful to measuring the presence and extent of Plaintiff's migraines; nor did she instruct why the absence of such evidence undermined the treating physicians' analyses.

A stronger rationale was needed to dislodge the medical opinions, which were based on evidence that contained the signs and symptoms relevant to migraines. Many reports indicate that the moderate to severe headaches occurred frequently and lasted for hours or

days, sometimes disrupting her sleep. *See, e.g.*, (R. 11, at PageID.449, 452, 454, 456, 458, 529, 536, 573, 575, 576, 578, 870, 943.) Plaintiff experienced throbbing pain that centered in one part of her head, which was aggravated by normal activities. *See, e.g.*, (R. 11, at PageID.574, 941, 946.) Nausea and vomiting accompanied the migraines. *See, e.g.*, (R. 11, at PageID.571.) Visual disturbances were also often recorded in the medical notes, which Dr. Emmer found to be migraine aura and Dr. Dillard characterized as photophobia; other records similarly indicate that lights triggered the headaches. *See, e.g.*, (R. 11, at PageID.510, 567, 571, 941.) Dizziness was noted as well, and Dr. Emmer observed her unsteady state and slight "wobbly-like movements" on occasion. *See, e.g.*, (R. 11, at PageID.545, 458, 540, 567, 569, 572, 573, 578, 943.) She needed to lie down, often in a dark, quiet room, and on multiple occasions she was observed doing just that while at the hospital. *See, e.g.*, (R. 11, at PageID.571, 889, 897, 904, 909, 917, 924, 973.)[9]

In short, the record contains, in great abundance and covering a long time period, diagnostic evidence relevant to migraines. It appears that the treating physicians relied on these criteria in their diagnoses. The absence of irrelevant traditional objective data thus was not a "good reason" for rejecting their opinions. On remand, the ALJ might be able to explain why, in this case, the traditional forms of evidence are meaningful. Or she might have reason to discount the evidence that conforms to the relevant criteria that undergirds

---

[9] Some of the records indicating she was resting at the hospital come shortly after the end of her insured status. *See, e.g.*, (R. 11, at PageID.924.) Because they date from after the relevant period—but just barely— they are not as probative unless they relate back to the insured period. *See Moran v. Comm'r of Soc. Sec.*, 40 F. Supp. 3d 896, 920-921 (E.D. Mich. 2014). Here, these records do establish the impairment's continuity because they were developed shortly after the close of the insured status period and they reflect the earlier reports that she needed to lie down in the dark. Thus, they are somewhat more useful than the usual post-insured-status evidence.

the medical opinions. For example, a close examination of the record might reveal that this evidence is too entwined with Plaintiff's dubious subjective complaints for the treating physicians to reasonably rely on it in their diagnoses and opinions. Indeed, the record contains test results and other records casting doubt on Plaintiff's credibility. *See, e.g.*, (R. 11, at PageID.465, 469, 472.) But the ALJ cannot reject the only treating source opinions in the record based on the lack of traditional forms of "objective" evidence without considering whether those forms are relevant or whether other evidence is diagnostically meaningful in this context.

### ii.   Treatment Gap

The ALJ's analysis of the treatment gap likewise fails to provide a "good reason" for rejecting Dr. Emmer's opinion. As noted, the ALJ found it relevant that Plaintiff "did not seek treatment from Dr. Emmer from January 7, 2013 through August 11, 2014." (R. 11, at PageID.206.) Such failures to pursue treatment can diminish a claimant's credibility, Soc. Sec. Ruling (SSR) 96-7p, 1996 WL 374186, at *7 (July 2, 1996), and provide a "good reason" for rejecting a treating physician opinion, *Sito v. Comm'r of Soc. Sec.*, No. 3:17CV1979, 2018 WL 4179457, at *2 (N.D. Ohio Aug. 31, 2018). But treatment gaps that are inflicted upon claimants by impecunity cannot be held against them or their medical providers.  SSR 96-7p provides that an

> adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment. The adjudicator may need to recontact the individual.

1996 WL 374186, at *7. One such explanation is that the claimant cannot afford the treatment or access free or low-cost services. *Id.* at *8; *see also Hudson-Kane v. Berryhill*, 247 F. Supp. 3d 908, 918-919 (M.D. Tenn. 2017) (finding the ALJ's rejection of a medical opinion due to the plaintiff's noncompliance with a treatment plan was unreasonable where the plaintiff could not afford the treatment). This is true even when the treatment might remedy the impairment and remove the disability. *See McKnight v. Sullivan*, 972 F.2d 241, 242 (6th Cir. 1990); 3 Soc. Sec. Law & Prac. § 38:14 (2018).

The ALJ failed to consider whether Plaintiff could afford continued treatment with Dr. Emmer during the gap period. This was a mistake that prevents the ALJ's rationale from being a "good reason" to reject Dr. Emmer's opinion. The need to scrutinize affordability was patent from the record. Dr. Emmer's January 7, 2013 session notes—the last before the gap—stated that Plaintiff's "insurance company is no longer paying for treatment." (R. 11, at PageID.578.) Other records corroborate this statement. At an appointment at Royal Oak Hospital in February 2014—near the middle of the gap—Plaintiff reported having no insurance and being forced to discontinue seeing Dr. Emmer as a result. (R. 11, at PageID.645-646.) During other periods she also lacked insurance, had coverage claims rejected, or could not afford certain medications. *See, e.g.*, (R. 11, at PageID.792, 731, 761, 749, 800, 802, 803, 806, 827, 839.)[10]

---

[10] Again, certain cited records postdate the insured status period. But they display the continuity of her insurance problems. *See supra* footnote 10. And because the records relate to her insurance, not her physical condition, the usual danger with such materials—that they do not reflect the claimant's condition during the relevant period because her condition has worsened, *see, e.g.*, *Siterlet v. Sec'y of Health & Human Servs*, 823 F.2d 918, 920 (6th Cir. 1987) (noting that the post-insured status period was not probative because the plaintiff suffered from a degrative disorder)—is not present.

Defendant seeks to salvage the ALJ's analysis with two arguments. First, Defendant observes that despite the gap Plaintiff's physical examinations were normal when she returned to Dr. Emmer, with the exception of trigger points. (R. 20, at PageID.1116-1117.) But this is unavailing because, for the reasons above, these results are unrelated to migraines, except again for the trigger points which serve to prove some degermation. It further ignores the statement in Dr. Emmer's notes at the end of the gap period that Plaintiff's "[h]eadaches have increased." (R. 11, at PageID.735.) It is also unclear that Defendant's unstated premise is correct; the argument is built upon the assumption that migraines will deteriorate without treatment. Perhaps. But proof of the assumption is needed.

Defendant's second argument is that Plaintiff was able to obtain medical treatment during the gap on a few occasions, but she neither focused on migraines nor ever sought emergency treatment for them. (R. 20, at PageID.1118.) The threshold problem with this argument is that the ALJ did not consider it. Thus it appears to be an impermissible *post hoc* rationalization of the agency's action that the agency did not rely on when taking that action. *See Erb v. Comm'r of Soc. Sec.*, No. 13-CV-14798, 2015 WL 730130, at *31 (E.D. Mich. Feb. 19, 2015) ("The government as a litigant cannot provide, and the court cannot develop or accept, after-the-fact rationalizations for the agency decision 'that the agency had not relied on in its [disputed] decision.'" (citation omitted).) But assuming it is properly raised, it at best gives the ALJ some countervailing evidence to consider on remand. It is not probative enough, on its own, to prevent that remand. Defendants cites only three hospital visits. (R. 11, at PageID.642-649.) All mentioned the history of migraines. (*Id.*)

36

Two were for gynecological examinations; the other, contrary to Defendant's implication, was for various issues *including* migraines. In fact, it appears she received prescription medicine for migraines at the visit. (R. 11, at PageID.606-607.) Also, there is no evidence concerning how Plaintiff obtained those visits, that she could have afforded more, or that low-cost services were available to her.

Thus, I disagree with Defendant's arguments concerning the treatment gap and conclude that the discontinuance in treatment was not a "good reason" for rejecting Dr. Emmer's opinion. On remand, the ALJ might reach the same conclusion as she did the first time—but she must do so under the proper framework, considering Plaintiff's access to affordable services.

### iii.    Job Search

Next is the ALJ's use of Plaintiff's job search as a reason to reject the treating physicians' opinions. Courts have held that job hunting is evidence that can cut against disability. See, e.g., *Dowlen v. Colvin*, 658 F. App'x 807, 812 (7th Cir. 2016) (noting that the ALJ can consider the fact that a claimant is "looking for work," and that the claimant there did not "explain how she could be able to take on new work if her pain was as severe as she said"); *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1227 (9th Cir. 2009) (noting that the ALJ could discredit the plaintiff's claim of debilitating illness due to her recent work experience and the fact she "sought out other employment since then"); *Coleman v. Comm'r of Soc. Sec.*, No. 15-cv-13289, 2016 WL 5388949, at *4 (E.D. Mich. July 27, 2016) (noting the ALJ could rely on evidence that the plaintiff continued to seek employment), *rep. & rec. adopted by* 2016 WL 5341099 (Sept. 23, 2016); *Ronning v.*

*Colvin*, No. 14-11893, 2016 WL 3319690, at *3 (E.D. Mich. May 20, 2016) (noting that

the ALJ's reliance on the plaintiff's continued job search was reasonable and supported the

credibility finding), *rep. & rec. adopted by* 2016 WL 3181906 (E.D. Mich. June 8, 2016);

*Brown v. Comm'r of Soc. Sec.*, No. 12-14829, 2014 WL 1118407, at *16 (E.D. Mich. Mar.

21, 2014) (same). But such evidence must be handled with care because a mere desire to

work might express nothing else than the hope of leading a normal life, and seeking work

might be a reaction to dire financial straits. See *Voigt v. Colvin*, 781 F.3d 871, 876-77 (7th

Cir. 2015); *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005).

I cannot conclude that the ALJ carefully utilized the job search here. While it might

amount to evidence discrediting Plaintiff and her physicians, this conclusion should be

reached only after considering the true scope and nature of the search. The evidence comes

from Dr. Last's notes from February through April 2013. (R. 11, at PageID.513.) At first,

they simply "looked at possible job settings that would not be too stressful for her." (*Id.*)

During the next session, they "continu[ed] to discuss the important challenge of becoming

more social in trying to think about getting a job." (*Id.*) The following discussion focused

on her anxiety about seeking employment. (*Id.*) Jobs did not come up at the next two

sessions. (*Id.*) So far, there was nothing in these reports to indicate that she took any

significant actions to obtain work.

In April, however, the notes stated she had "been searching for jobs in a more

concentrated fashion." (*Id.*) Yet, six days later she was waylaid by a severe migraine and

put the search on hold. (R. 11, at PageID.514.) The search recommenced the following

week, but with diminished expectations. (*Id.*) She now considered part-time work to

accommodate her conditions. (*Id.*) At the final recorded session seven days later, she was still considering employment but now weighed it against seeking disability benefits. (*Id.*)

Thus, the picture that emerges is not of a confident and energetic journey to rejoin the workforce. These additional details put wrinkles in the ALJ's blunt assessment that "as of April 2013, the claimant felt well enough to look for work." (R. 11, at PageID.203.) Those wrinkles must be scrutinized before Plaintiff's seemingly tepid job search is used against Dr. Emmer's opinion.

### iv.    Dr. Dillard

Regarding Dr. Dillard, Plaintiff argues that he merits treating physician status. (R. 16, at PageID.1093.) But Defendant does not appear to dispute that Dr. Dillard was a treating physician and was characterized as such by the ALJ. (R. 20, at PageID.1120 n. 4.)[11] To the extent a dispute exists regarding Dr. Dillard, it would center upon the level of treatment during the insured status period. As the ALJ noted, Dr. Dillard treated Plaintiff for around two months before the insured status period expired. (R. 11, at PageID.207.) Yet, Plaintiff observes that Dr. Dillard produced the medical source opinion after a year's worth of treatment, much of it outside the insured status period. (R. 16, at PageID.1093.) The question thus arises whether the ALJ properly discounted the opinion because Dr. Dillard saw Plaintiff for only two months of the insured period.

The regulations do not speak directly to this issue but they do require ALJs to

---

[11] The ALJ somewhat ambiguously observed that Dr. Dillard was "not a long-time treating physician." (R. 11, at PageID.207.) Defendant appears to concede that Dr. Dillard's treating-physician status by noting that "there is no indication that the ALJ did not" consider him a treating physician. (R. 20, at PageID.1120 n. 4.)

consider the length, frequency, nature, and extent of the treating relationship, and also permit consideration of "[o]ther factors." 20 C.F.R. § 404.1527(c). Under the same basic facts as the present case, one court has held that treating source opinions such as Dr. Dillard's are not "purely retrospective opinion[s]" because they result from "first-hand knowledge of Plaintiff's condition prior to her date last insured." *Little v. Comm'r of Soc. Sec.*, No. 16-11968, 2017 WL 4276968, at *4 (E.D. Mich. Sept. 27, 2017). This does not, of course, require ALJs to blind themselves to the limited overlap between the treatment and the insured status period. Because the regulations allow for a wide-ranging inquiry into a treating relationship, I suggest that the ALJ here did not err by considering the extent of Dr. Dillard's treatment in the insured status period.

### H. Conclusion

In conclusion, I suggest that the ALJ's key reasons for discounting the treating physician opinions were not "good reasons" under 20 C.F.R. § 404.1527(c). Further, I suggest that the error cannot be overlooked as harmless because it marred the analysis of the only two treating physician opinions on Plaintiff's off-task time and absenteeism. These potential limitations were dispositive, as the VE's testimony shows. (R. 11, at PageID.266-268.) More than 15 percent time spent off-task would preclude work, as would more than two missed days a month. (*Id.*) Both treating physicians' opinions estimate off-task time and absenteeism exceeding these work preclusive bounds.

The ALJ did not assemble medical source opinions comparable to the treating physicians in order to support her conclusion. In general, she cited one-time evaluations or non-evaluating consultants who reviewed the records. For example, she noted the one-off

evaluation by a medical consultant, Dr. Mari Jurado, which found normal strength and coordination. (R. 11, at PageID.197, 669-671.) But as discussed above, the ALJ did not explain how metrics such as these were relevant to migraines. She also cited Dr. Tsai's conclusion that Plaintiff had moderate concentration, persistence, and pace difficulties. (R. 11, at PageID.198, 283.) But Dr. Tsaifa never evaluated Plaintiff, and he reviewed the record in October 2014, before it closed. *See* 20 C.F.R. § 404.1527(c)(1) ("Generally, we give more weight to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you.") Typically, ALJs will not give greater weight to non-examining consultants than to treating physicians unless, for example, the consultant reviewed an entire case record containing reports unavailable to the treating physician. SSR 96-7p, 1996 WL 374180, at *3. That was not the case here.

The ALJ also noted Dr. Ellenberg's reports during the Functional Recovery Program indicating Plaintiff's progress, (R. 11, at PageID.204-205), but those came from the very beginning of the insured status period, and the ALJ did not analyze them in any detail. The ALJ also gave "significant weight" to Dr. Boneff's assessment, after an evaluation, that Plaintiff did not have cognitive impairments. (R. 11, at PageID.207, 667.) The assessment does not opine on absenteeism, however, and in any event came after a lone session.

In sum, these sources cannot overcome the errors committed with the treating physicians. Thus, I suggest those errors require remand. For these reasons, I conclude that substantial evidence does not support the ALJ's decision. Consequently, I recommend **GRANTING** Plaintiff's Motion, (Doc. 16), **DENYING** the Commissioner's Motion,

(Doc. 20), **VACATING** the Commissioner's final decision denying benefits, and **REMANDING** the case to the Commissioner under "sentence four" of 42 U.S.C. § 405(g).

## III. <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1,"

"Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  December 18, 2018                    S/ PATRICIA T. MORRIS
                                           Patricia T. Morris
                                           United States Magistrate Judge


## **CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: December 18, 2018                     By s/Kristen Castaneda
                                           Case Manager